J-S08045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE INTEREST OF: H.C., MINOR CHILD | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., MOTHER | : | No. 1613 WDA 2016 |

Appeal from the Order Entered September 23, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000060-2016

| | | |
|---|---|---|
| IN RE: THE INTEREST OF: L.C., MINOR CHILD | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., MOTHER | : | No. 1614 WDA 2016 |

Appeal from the Order Entered September 23, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000061-2016

BEFORE:   GANTMAN, P.J., FORD ELLIOTT, P.J.E., and SOLANO, J.

MEMORANDUM BY GANTMAN, P.J.:          **FILED FEBRUARY 13, 2017**

Appellant, A.C. ("Mother"), appeals from the orders entered in the Allegheny County Court of Common Pleas Orphans' Court, which granted the petitions filed by the Allegheny County Office of Children, Youth, and Families ("CYF") for involuntary termination of Mother's parental rights to her minor children, H.C. and L.C. ("Children").  We affirm.

In its opinions, the Orphans' Court fully and correctly set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

Mother raises six issues on appeal:

(1)  DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION AND ERR IN GRANTING THE PETITION FOR INVOLUNTARY TERMINATION OF PARENTAL…RIGHTS PURSUANT TO 23 PA.C.S.A. § 2511(A)(2), (5) AND (8)?

(2)  DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION AND ERR IN NOT DETERMINING SPECIFICALLY BY CLEAR AND CONVINCING EVIDENCE THAT CHILDREN WOULD NOT BE ADVERSELY AFFECTED BY SEVERANCE OF THE STRONG BOND EXTANT BETWEEN [MOTHER] AND THESE CHILDREN?

(3)  DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION AND ERR AS A MATTER OF LAW IN DETERMINING THAT PLACEMENT WITH THE FOSTER PARENTS IN THIS CASE (AND ADOPTIVE RESOURCE) WOULD BE IN THE BEST INTERESTS OF THESE CHILDREN?

(4)  DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION AND ERR AS A MATTER OF LAW IN FINDING THAT THE INVOLUNTARY TERMINATION OF FATHER'S PARENTAL RIGHTS WAS APPROPRIATE THUS PREVENTING RETURN OF CHILDREN TO THE FAMILY AND ABRIDGING MOTHER'S RIGHTS ALSO?

(5)  DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION AND ERR AS A MATTER OF LAW IN DETERMINING THAT THE INVOLUNTARY TERMINATION OF [MOTHER'S] PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.A. § 2511(A)(2), (5) AND (8) OF THE ADOPTION ACT BEST SERVES THE NEEDS AND WELFARE OF THESE CHILDREN?

(6)  DID THE [ORPHANS'] COURT ABUSE ITS DISCRETION AND ERR AS A MATTER OF LAW IN DETERMINING THAT THE INVOLUNTARY TERMINATION OF [MOTHER'S] PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.A. §

J-S08045-17

2511(A)(2), (5) AND (8) WAS IN THE BEST INTERESTS OF THESE CHILDREN?

(Mother's Brief at 5-6).[1]

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility

_____

[1] To the extent Mother's issue #4 complains on appeal about the termination of either birthfather's parental rights to Children, Mother is not the proper party to make that argument. *See generally In re T.J.*, 559 Pa. 118, 124, 739 A.2d 478, 481 (1999) (stating: "In determining whether a party has standing, a court is concerned only with the question of who is entitled to make a legal challenge and not the merits of that challenge"; "the purpose of the 'standing' requirement is to insure that a legal challenge is by a proper party"). Therefore, we give Mother's issue #4 no further attention.

- 3 -

of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYF filed a petition for involuntary termination of Mother's parental rights to Children on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

- 5 -

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8),  the following factors must be demonstrated: (1) [t]he child has been removed from parental care for [twelve] months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).  "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.,* 837 A.2d 560, 564 (Pa.Super.2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.,* 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the

child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Donald R. Walko, Jr., we conclude Mother's remaining issues merit no relief. The trial

court opinions comprehensively discuss and properly dispose of the questions presented. (*See* Orphans' Court Opinions, filed November 17, 2016, at 11-15 and 9-13 respectively) (finding: during two year period since Children's placement with maternal grandparents, Mother made minimal progress with her family service plan goals; court had serious concerns about Mother's ability to provide stable environment necessary for Children's physical and mental wellbeing; Mother admitted during proceedings she struggled to achieve sobriety, was homeless at times, and was convicted and sentenced to probation for prostitution; these behaviors are not safe or conducive to Children's wellbeing and display repeated and continued incapacity to provide Children with essential care; Mother acknowledged to Dr. O'Hara on March 22, 2016, that Mother was not in position to care for Children; record suggests Mother is still struggling to achieve and maintain sobriety; Mother had opportunity for two years to remedy her problems and adequately support Children's needs, but she failed to do so; Dr. O'Hara testified adoption outweighs any potential detriment related to termination of Mother's parental rights to Children; Children's secure attachment is to maternal grandparents, who provide stable and nurturing environment for Children; Children have spent majority of their lives in maternal grandparents' care; Mother's lack of stability poses threat to Children's emotional and behavioral needs; Mother attended only 70% of her scheduled visits with Children; H.C. reported his desire to reside with

maternal grandparents and said he does not enjoy visits with Mother; court found no substantial bond existed between Mother and Children; termination of Mother's parental rights best serves Children's developmental, physical, and emotional needs; termination of Mother's parental rights was proper pursuant to Sections 2511(a)(2), (a)(5), (a)(8), and (b)).  Accordingly, we affirm on the basis of the Orphans' Court's opinions.

Orders affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date:  2/13/2017

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION – JUVENILE SECTION

IN THE INTEREST OF: H.C., a minor child,

APPEAL OF: A.C., natural mother.

**CHILDREN'S FAST TRACK APPEAL**

OPINION

No.: CP-02-AP-0000060-2016
FID: 02-FN-092189-2010
JID: 92189-A
Docket: 1613 WDA 2016

BY:

Honorable Donald R. Walko, Jr.
City-County Building
414 Grant Street, Room 706
Pittsburgh, PA 15219

COPIES TO:

Counsel for Allegheny County
Children, Youth and Family Services
Alexandra Gruskos, Esq.
Fort Pitt Commons Bldg., Suite 101
445 Fort Pitt Blvd.
Pittsburgh, PA 15219

Counsel for H.C. as Guardian ad Litem:
Cynthia Moore, Esq.
Kids Voice
437 Grant Street, Suite 700
Pittsburgh, PA 15219

Counsel for A.C.:
Richard P. Kimmins, M.B.A., Esq.
Richard P. Kimmins and Associates
P.O. Box 15884
Pittsburgh, PA 15244

FILED

15 NOV 17 PM 2:05

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION – JUVENILE SECTION

IN THE INTEREST OF: H.C., a minor child,    **CHILDREN'S FAST TRACK APPEAL**

                                  OPINION

APPEAL OF: A.C., natural mother.

No.: CP-02-DP-0001191-2014
FID: 02-FN-092189-2010
JID: 92189-A

OPINION

WALKO, J.                                                    November 17, 2016

## I. PROCEDURAL HISTORY

This appeal stems from the involuntary termination of the parental rights of the natural mother, A.C. ("Mother") to H.C. (D.O.B.: 7/ /2010) ("the Child"). Allegheny County Office of Children, Youth and Family Services ("CYF") has been involved with this family since November of 2013. Mother was initially compliant with the family plan goals established by CYF. On June 8, 2014 the Child was again referred to CYF after Mother was involved in an accident and admitted to being under the influence of narcotics. The Child was removed and placed with his maternal grandparents.

The Child was adjudicated dependent on September 8, 2014. *See* Order of Court, dated September 8, 2014. The Permanent Placement Goal for the Child was to return him to Mother. *See* Order of Court, dated December 2, 2014.

In the two years following the adjudication of dependency the Court held multiple Permanency Review Hearings. Mother made little to no progress toward accomplishing the established family plan goals. On March 24, 2015, the Court held a Permanency Review Hearing

1

and found that Mother had been moderately compliant with the permanency plan. *See* Permanency Review Order, dated March 24, 2015. Another Permanency Review Hearing was held on June 16, 2015 and the Court found that Mother had made "minimal progress toward alleviating the circumstances which necessitated the original placement." *See* Permanency Review Order, dated June 16, 2015. On October 13, 2015 the Court again held a Permanency Review Hearing and again found Mother to be minimally compliant with established goals.[1] *See* Permanency Review Order, dated October 13, 2015.

On April 12, 2016, the Court again found Mother to have made "minimal progress toward alleviating the circumstances which necessitated the original placement" of the Child. *See* Permanency Review Order, dated April 12, 2016. On April 12, 2016 the Court determined that adoption would be the new permanent placement goal. *Id.* CYF subsequently filed a Petition for Termination of Parental Rights. On September 23, 2016, following a hearing on the Petition, this Court entered an Order terminating the parental rights of Mother to the Child. The Court further awarded custody of the Child to CYF in order to initiate adoption proceedings. Termination of Mother's parental rights also extinguished her right to object to or receive notice of adoption proceedings regarding the Child. *See* Order of Court, dated September 23, 2016. Mother appeals.

Mother makes five arguments on appeal. First, she contends that the Court erred and abused its discretion in granting the Petition for Involuntary Termination of Parental Rights pursuant to 23 Pa.C.S.A. 2511(a)(2) and (8). Second, Mother argues that the Court erred and abused its discretion in not determining if the severance of the bond existing between Mother and the Child would adversely affect the Child. Third, Mother contends that the Court abused its discretion and erred when it determined by clear and convincing evidence that placement of the Child with the foster

---

[1] The Order of Court states that "[t]here has been minimal compliance with permanency plan, in that Mother has not signed releases of information for the agency. Mother does not submit to random urine screens. Mother does not maintain contact with the agency."

parents was in the best interest of the Child. Mother also argues that Court abused its discretion in finding that the involuntary termination of the parental rights best serves the needs and welfare of the Child. Finally Mother argues that the Court abused its discretion and erred in determining by clear and convincing evidence that termination of parental rights was in the Child's best interests when he stated that he wanted to return home. *See* Mother's Concise Statement of Matters Complained of on Appeal, at Paragraph 1(a)-(e). For the following reasons, this Court's Order should be affirmed.

## II. FACTS

### a. Allegheny County Office of Children, Youth and Family Services

Amber Saunders, a CYF Caseworker assigned to the case, testified regarding the circumstances under which the Child became involved with CYF and Mother's progress thereafter[2]. Ms. Saunders testified that CYF began working with the family in November of 2013 due to issues with drugs and alcohol. *See* T.P.R. Hearing, 8/23/16, at 8. In November of 2013 Mother gave birth to a daughter, L.C. *Id.* Ms. Saunders testified that CYF initially became involved because the agency was informed that Mother had been in drug treatment prior to giving birth to L.C. and that L.C. tested positive for cocaine and opiates at birth. *Id.* at 9. Mother was referred to Pennsylvania Organization for Women in Early Recovery ("POWER"). *Id.* CYF established "family service plan goals" which included completing drug and alcohol and mental health evaluations, attending parenting classes and scheduled visits at Arsenal Family and Children's Center ("Arsenal"), acquiring stable and appropriate housing and maintaining contact and cooperation with CYF. *Id.* at 10. Ms. Saunders testified that Mother was initially compliant with the family plan goals. *Id.* at 11, 12. On June 8, 2014, however, Mother and L.C.'s father were involved in a car accident. *Id.* at 8.

---

[2] Ms. Saunders testified on the first day of a two-day hearing. Citations to her testimony refer to the transcript from the Termination of Parental Rights Hearing of 8/23/2016.

3

L.C.'s father was driving when he rear-ended another vehicle that was stopped in front of him. *Id.* Mother was admitted to the intensive care unit and was treated for a spinal fracture. *Id.* At the hospital Mother disclosed her use of Subotex and heroin. *Id.* Ms. Saunders testified that it was clear that Mother had relapsed and CYF wanted her to readdress her issues accordingly. *Id.* at 11, 12. The Child was removed from Mother's care and placed in the custody of his maternal grandparents. *Id.*

Based on Mother's self-reported relapse CYF again established family plan goals. *Id.* Specifically, CYF wanted Mother to continue drug and alcohol treatment and to be consistent in attending urine screens. *Id.* Mother was re-referred to POWER for assistance. *Id.* at 11. POWER reported to CYF, however, that they were unable to reach Mother. *Id.* at 26. CYF never received confirmation of Mother's POWER assessment. *Id.* at 26. Mother was also referred to Mercy Behavioral Health ("Mercy") for mental health services. *Id.* at 16. CYF recommended that Mother participate in a dual diagnosis program that would address both her mental health and her issues with drugs and alcohol. *Id.* CYF also provided in-home services through Wesley Spectrum to Mother from July 2015 until September 2015. *Id.* Wesley Spectrum services were discontinued, however, because of Mother's noncompliance. *Id.* CYF received records that Mother attended Tadiso, an outpatient opioid treatment facility, for methadone maintenance in the fall of 2014 until December of 2015. *Id.* at 18. Thereafter Mother went to Alliance for methadone maintenance. *Id.* Mother's report indicated that at the time of the hearing she was not receiving any formal treatment but that she intended to go to Mercy. *Id.* Ms. Saunders testified that CYF was aware that Mother was last involved in methadone maintenance in May of 2016. *Id.* CYF called in random urine screens for Mother but she was not consistent in her compliance. *Id.* Mother was called for 77 screens and attended 24. *Id.* at 19. Mother was ordered by the Court to submit to hair follicle tests

4

and failed to do so on multiple occasions. *Id.* at 18. Mother reported to CYF that she is "clean" but Ms. Saunders testified that she had no evidence to support Mother's claim. *Id.* at 19. Ms. Saunders further testified that at the time of the hearing it was CYF's opinion, that Mother had not successfully addressed her addiction or completed her drug and alcohol goals. *Id.* at 18.

CYF established goals for Mother to obtain stable and appropriate housing and provided her with information for shelters and other programs. *Id.* at 10, 20. Mother's housing has been unstable throughout the pendency of this case. *Id.* at 20. Mother had housing with L.C.'s father from May of 2015 until February of 2016 when the couple was evicted. *Id.* Following the eviction Mother was homeless and staying at shelters or with friends. *Id.* CYF considers a parent to be homeless if they are staying in shelters. *Id.* Ms. Saunders testified that Mother obtained housing with L.C.'s father in July or August of 2016. *Id.* at 29.

With respect to visitation, CYF had established goals for Mother to attend parenting classes and scheduled visits and to maintain contact and cooperation with the agency. *Id.* at 10. Mother always visited the Child together with L.C.'s father. *Id.* at 30. Visits were initially required to be supervised until August of 2015. *Id.* Mother participated in supervised parenting visits at Arsenal. *Id.* at 28. She successfully completed the Arsenal program on May 19, 2015. *Id.* From August 2015 until March of 2016 Mother was permitted to have unsupervised community visits. *Id.* CYF reverted back to supervised visits due to safety concerns when Mother was evicted and homeless. *Id.* Mother and L.C.'s father visited the Child at the CYF East Office thereafter. *Id.* at 30. Ms. Saunders testified that the staff who supervised the visits had concerns that Mother "misreads the [Child's] cues." *Id.* at 43. CYF had also recommended that Mother attend the Three Rivers Adoption Council ("TRAC") for individual and family therapy. *Id.* at 33. Mother, however, failed to engage the services of TRAC. *Id.* CYF had continuous issues with visitation. *Id.* Mother constantly

5

confirmed visits and then failed to arrive as scheduled. *Id.* The Child would be taken to the CYF office for a confirmed visit and the couple would often not show. *Id.* CYF attempted to solve the problem by requiring the couple to confirm visits 24 hours ahead of time. *Id.* at 31. Even when the couple confirmed visits, however, there were times when they would not appear. *Id.* CYF had difficulty communicating with Mother and did not have a working telephone number for the couple. Ms. Saunders testified that when she was in contact with Mother, Mother was compliant and made an effort to work through the planning process. *Id.* at 21. Often, however, Ms. Saunders had to be physically present in order to communicate with Mother. *Id.* at 47. Ms. Saunders further testified that Mother has not met her contact goals. *Id.*

Mother and L.C.'s father attended only 132 of the 187 scheduled visits – "about 70%." *Id.* at 30. The couple was initially given visitation twice per week: Thursdays from 4:00 PM until 7:00 PM and Sundays from 12:00 PM until 2:00 PM. *Id.* By the time of the September 23, 2016 hearing, however, the visits were reduced to once a week due to lack of progress. *Id.* at 38. The most recent visit occurred on August 18, 2016. *Id.* That visit ended early because a CYF caseworker had concerns with the couples' interaction with the Child. *Id.* at 56. A confrontation ensued between the couple and the caseworker when the caseworker terminated the session. *Id.*

Given the above information, Ms. Saunders testified that Mother had not successfully completed the CYF family service plan goals. *Id.* at 33. By the time of the hearing, CYF remained concerned that they could not confirm whether or not Mother was still abusing drugs and that she had a history of instability with respect to housing. *Id.*

6

### b. Psychological Evaluations

Dr. O'Hara is a licensed psychologist in Pennsylvania who evaluated all of the parties involved in this case.[3] (*See* T.P.R. Hearing, 9/13/2016). Dr. O'Hara performed an interactional evaluation with the Child and the maternal grandparents on March 1, 2016. *Id.* at 4. The maternal grandparents reported caring for the Child for the majority of his life. *Id.* at 5. Dr. O'Hara testified that the maternal grandparents "presented with stability" and had no history of substance abuse or criminal activity. *Id.* at 4-6. The maternal grandparents displayed positive parenting skills and were engaging. *Id.* at 6. The Child approached the maternal grandparents frequently and spontaneously and interacted well with them. *Id.* Dr. O'Hara further testified that the Child displayed "all indicators of secure attachment" to his grandparents as caregivers. *Id.*

Dr. O'Hara testified that Mother had previously reported to him in June of 2013. *Id.* at 8. At that time Mother reported that she was unable to commit to twice-weekly treatments which Dr. O'Hara found to be warranted for her. *Id.* Mother also reported that the Child had been in the care of his maternal grandfather for approximately one year when he was one year old. *Id.* Mother participated in an individual evaluation with Dr. O'Hara on March 22, 2016. *Id.* at 4. Dr. O'Hara testified that there were a variety of concerns surrounding Mother. *Id.* at 8. Mother acknowledged relapses after three rehabs and a variety of other treatments. *Id.* at 9. Mother disclosed her criminal history which includes convictions for prostitution, retail theft and possession. *Id.* at 8. She was unemployed, homeless and on probation at the time of the evaluation. *Id.* Dr. O'Hara testified that Mother had less than 90 days of "clean time" at the time of the evaluation. *Id.* at 9. Mother reported that in nine years her longest period of "clean time" was 18 months and that part of it was during her

---

[3] Dr. O'Hara testified on the second day of a two-day hearing. Citations to his testimony refer to the transcript from the Termination of Parental Rights Hearing of 9/13/2016.

7

pregnancy with the Child. *Id.* Dr. O'Hara reported that Mother was "defensive in psychological testing" and diagnosed her with "opioid use disorder severe, on maintenance therapy." *Id.*

Dr. O'Hara performed an interactional evaluation with Mother, L.C.'s father and the Child on March 22, 2016. *Id.* He testified that Mother displayed positive parenting skills, that she was playful and calm and that she showed affection well. *Id.* During the evaluation the Child was calm and relaxed with Mother and L.C.'s father and Dr. O'Hara found there to be components of security in their relationship. *Id.* at 11. Dr. O'Hara testified, however, that he had substantial concerns regarding Mother's stability. *Id.* at 12. Specifically Dr. O'Hara was concerned that Mother still showed signs of being unable to care for the Child despite him being removed for two years. *Id.* Mother acknowledged that she was not in a position to care for the Child. *Id.* During the evaluation the Child displayed signs of noncompliance and when Dr. O'Hara asked him what he liked about his parents he reported that he "did not know." *Id.* at 12.

Dr. O'Hara also conducted an individual evaluation with the Child on March 1, 2016. *Id.* The Child presented as "happy and active" at the evaluation. *Id.* Dr. O'Hara testified that he believed that the Child was on track with milestones of language, cognition and movement. *Id.* at 7. The Child reported to Dr. O'Hara that he preferred to reside with his maternal grandparents and that he did not like visits with his Mother and L.C.'s father. *Id.* Dr. O'Hara testified that he had concerns that warranted ongoing treatment for the Child. *Id.* at 7. According to the maternal grandmother, the Child can be "irritable with visits" with Mother and L.C.'s father and has difficulty sleeping without sleep medication. *Id.* Dr. O'Hara testified that the Child exhibited compulsive, destructive behaviors and anxiety and reported hitting himself. *Id.* The Child was diagnosed with "attention deficit hyperactivity disorder ('ADHD'), adjustment disorder with mixed

8

disturbance of emotions and conduct and ADHD combined presentation moderate." *Id.* at 8. Dr. O'Hara testified that the maternal grandparents are adequately addressing these concerns. *Id.*

Dr. O'Hara considered all of the information from CYF, discussed *supra,* and additional information from KidsVoice in rendering his opinion. *Id.* at 12, 13. He testified that he received reports that Mother was not attending treatment outside of her methadone or suboxone clinics. *Id.* In Dr. O'Hara's opinion this type of treatment is "substandard" on its own. *Id.* at 13. He also considered the evaluations and the level of attachment between the Child and the maternal grandparents as caregivers. *Id.* He testified that without security and stability for children they are at risk for a variety of problems which include a "lack of school readiness, behavioral issues, depression and anxiety and reactive attachment disorder." *Id.* at 15. Dr. O'Hara testified that he spoke with the Child's clinician who worked closely with the Child and the maternal grandparents. *Id.* at 14. The clinician reported that the maternal grandparents do a "great job in following through [the Child's] intervention, and he interacts with them really, really well. [The Child] had a bond with his grandfather since he was very young." *Id.* Dr. O'Hara had continuing concerns regarding Mother's failure to address her "extreme lack of stability," "significant substance abuse" and "long-term criminal activity." *Id.* at 15. Based on the foregoing Dr. O'Hara concluded that the benefits of adoption for the Child with the maternal grandparents outweigh the potential detriment of terminating Mother's parental rights. *Id.* at 16. Dr. O'Hara made these recommendations and came to these conclusions based upon a reasonable degree of psychological certainty. *Id.*

c. **Mother's Testimony**

Mother testified[4] that she has been "clean from methadone" since June 21, 2016 and that she became "clean" on her own. *See* T.P.R. Hearing, 9/13/2016, at 35. Mother gave birth to a third child

---

[4] Mother testified on the second day of a two-day hearing. Citation to his testimony refers to the transcript from the Termination of Parental Rights Hearing of 9/13/2016.

in November of 2015. *Id.* at 38. Mother testified that she had three surgeries during her pregnancy and that she was prescribed pain medication accordingly. *Id.* at 38. She signed a contract with her doctors under which she agreed to submit to weekly drug screens. *Id.* at 39. The doctors would continue to administer pain management medication so long as the drug screens reflected her use of methadone and prescribed pain medication only. *Id.* Mother testified that she was compliant with the terms of the contract. *Id.* As stated previously, Mother testified that she has been "clean" since June 21, 2016. *Id.* at 40. When asked if she had tests or screens to confirm her sobriety, however, Mother stated "I believe so. I'd have to look. I'm not sure." *Id.* She further testified that she is in a different situation in that she has stable housing and is no longer on a maintenance program. *Id.* at 36. Mother stated that she is voluntarily attending Narcotics Anonymous ("NA") and that she plans to start attending mental health services at Mercy once her back injury is healed. *Id.* She further testified that she is "in a better place with the [Child]" and that they have "really good visits." *Id.*

## STANDARD OF REVIEW

The standard of review in a termination of parental rights case is that of an abuse of discretion. The Supreme Court of Pennsylvania confirmed the standard of review as follows:

> [w]hen reviewing an appeal from a decree terminating parental rights, [the Superior Court is] limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, [the Superior Court] must accord the hearing judge's decision the same deference that it would give to a jury verdict. [The Superior Court] must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of S.P.*, 616 Pa. 309, 317 (2012) (quoting *In re: B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004)).

10

## DISCUSSION

In considering a petition for termination of parental rights a trial court is charged with determining whether grounds for termination have been established by clear and convincing evidence under 23 Pa.C.S. § 2511(a). The Court shall give "primary consideration to the developmental, physical and emotional needs and welfare of the child." Id. at § 2511(b). The statute further provides nine (9) grounds for termination. Id. at § 2511(a). A petitioning party need only establish one of the nine grounds to support a claim for termination of parental rights. Id. In this case, the Court found that Mother's parental rights should be terminated pursuant to § 2511(a)(2), (5) and (8).

Under § 2511(a)(2) a trial court may terminate parental rights based on clear and convincing evidence that the

> [r]epeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The Child was three (3) years old when this case was initially referred to CYF in November of 2013. As discussed *supra*, CYF established family service plan goals and Mother was initially compliant. It became clear, however, in June of 2014 that Mother had relapsed when she was involved car accident and reported her heroin use at the hospital. The Child was taken into custody by CYF and placed with his maternal grandparents. During the two years following the placement Mother has made little to no progress with respect to established family service plan goals. Ms. Saunders, a CYF caseworker, and Dr. O'Hara, a psychologist, both testified regarding Mother's lack of progress. Given the amount of time that the Child has been in placement and the testimony at the hearing, this Court has serious concerns regarding Mother's ability to provide a stable environment necessary for the physical and mental wellbeing of the Child. During the pendency of

11

this case Mother has admittedly struggled to achieve sobriety, has been homeless and was convicted and sentenced to probation for prostitution. None of these behaviors are safe or conducive to the wellbeing of the Child. These behaviors display a repeated and continued incapacity to provide essential care. Mother has attended 70% of the scheduled visits with the Child and has been largely noncompliant and uncooperative with CYF's contact and communication goals. As recently as March 22, 2016, Mother acknowledged to Dr. O'Hara that she was not in a position to care for the Child. Despite Mother's subsequent attempts it was apparent at the time of the hearing that these issues had not been adequately remedied by Mother.

Section 2511(a)(5) of the statute enables a trial court to terminate parental rights based on a finding that

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

As discussed *supra*, the Child was removed from Mother's care in June of 2014 and has since been placed with his maternal grandparents. The period of removal far exceeds the 6-month threshold provided for in the statute. Despite the efforts of CYF, KidsVoice and Dr. O'Hara, Mother continued to display the behavior that warranted removal of the Child in the first place. Mother disregarded the advice of CYF to contact TRAC and POWER for additional parenting assistance. The Court is cautious to accept Mother's claims of sobriety. Mother testified that her "clean date" is June 21, 2016. Not only is this a very recent date with respect to the two years that this case has been pending, but Mother has acknowledged multiple relapses after repeated attempts at rehabilitation. At the hearing Mother was unsure as to whether she could produce evidence of her

12

sobriety. It appears that given Mother's history of instability and inconsistency she is still struggling to achieve and maintain sobriety. This case has been pending with CYF since the removal of the Child in 2014. Mother has had two years, therefore, to become sober and stable. The Court finds that two years is more than a reasonable amount of time to remedy Mother's problems in order to adequately support the needs of the Child.

Dr. O'Hara testified that adoption at this point outweighs any potential detriment of the termination of parental rights. The Child has become attached to the maternal grandparents as caregivers. Maternal grandparents provide a stable and nurturing environment for the Child. The lack of stability and security offered by Mother pose a threat to the emotional and behavioral needs of the Child. Based on the foregoing the Court determined that termination of Mother's parental rights serves the needs and welfare of the Child.

Under § 2511(a)(8) a trial court may terminate parental rights based upon a finding of clear and convincing evidence that

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

The Court applied the same reasoning under §2511(a)(8) as under §2511(a)(5) in determining that clear and convincing evidence had been presented to warrant a termination of Mother's parental rights. In the interest of clarity the Court reiterates that two years have elapsed since the Child was removed from Mother's care. CYF and Dr. O'Hara testified regarding their concerns for Mother's progress and lack of stability. Both CYF and Dr. O'Hara opined that Mother was not in any position to appropriately care for the Child. Given Mother's drug history, criminal

13

background and lack of progress within a two-year period the Court determined that terminating Mother's parental rights serve the needs and welfare of the Child.

As stated *supra*, Pa.C.S. § 2511(b) requires a court to consider the developmental, physical and emotional needs and welfare of the child. The Superior Court of Pennsylvania has established that a trial court must consider the emotional bond, if any, between the parent and child as a factor in determining the needs of a child.

The Court first considered the Child's age during the pendency of this case. As stated *supra* the Child was three (3) years old when the case was first referred to CYF. Between the date of his removal and the date that he was adjudicated dependent, he turned four (4) years old. The Child was six (6) years old at the time of the hearing. The Child has spent the majority of his life in the custody of his maternal grandparents. Mother reported to Dr. O'Hara that the Child spent one year with his grandparents when he was one year old. The Child's clinician reported to Dr. O'Hara that he had a close bond with his maternal grandfather from a very young age. Mother was given the opportunity to visit the Child during the pendency of this case but has only attended 70% of her scheduled visits. Dr. O'Hara reported that the Child had expressed a desire to reside with his grandparents and that he did not enjoy visits with Mother. Due to the amount of time that the Child has spent away from Mother in the early years of his life and Mother's willful lack of visitation, the Court finds that there is not a substantial bond between Mother and the Child.

Dr. O'Hara testified that Mother displayed positive parenting skills and that she was playful, calm and affectionate. During the interactional evaluation, Dr. O'Hara found that the Child interacted well at times but that he showed signs of noncompliance with Mother. Dr. O'Hara further testified that the Child displayed signs of secure attachment to his maternal grandparents as caregivers. While Mother's positive interactions are noted, the Court finds that Child has a strong

14

bond with his maternal grandparents. Given the age of the Child and the level of attachment to his maternal grandparents, the Court finds that termination of parental rights best serves the developmental, physical and emotional needs of the Child.

## CONCLUSION

The law is clear that the purpose of dependency actions is to determine a permanent placement that best serves the needs and welfare of the child. The purpose is not to hold children in foster care until their parents get sober or become adequate caregivers no matter how long it takes. The Court determined that the termination of Mother's parental rights was necessary to serve the interests of the Child. For the foregoing reasons, this Court respectfully requests that Mother's appeal be denied and the decree terminating his parental rights to the Child be affirmed.

BY THE COURT:

_____, J.

Received 11/23/2016 5:34:07 PM Superior Court Western District
Circulated 01/25/2017 04:40 PM

Filed 11/23/2016 5:34:07 PM Superior Court Western District
1614 WDA 2016

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
### FAMILY DIVISION – JUVENILE SECTION

IN THE INTEREST OF: L.C., a minor child,

APPEAL OF: A.C., natural mother.

**CHILDREN'S FAST TRACK APPEAL**

OPINION

No.: CP-02-AP-0000060-2016
FID: 02-FN-092189-2010
JID: 92189B
Docket: 1614 WDA 2016

BY:

Honorable Donald R. Walko, Jr.
City-County Building
414 Grant Street, Room 706
Pittsburgh, PA 15219

COPIES TO:

Counsel for Allegheny County
Children, Youth and Family Services
Alexandra Gruskos, Esq.
Fort Pitt Commons Bldg., Suite 101
445 Fort Pitt Blvd.
Pittsburgh, PA 15219

Counsel for L.C. as Guardian ad Litem:
Cynthia Moore, Esq.
Kids Voice
437 Grant Street, Suite 700
Pittsburgh, PA 15219

Counsel for A.C.:
Richard P. Kimmins, M.B.A., Esq.
Richard P. Kimmins and Associates
P.O. Box 15884
Pittsburgh, PA 15244

FILED

16 NOV 17 PM 2:05

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION – JUVENILE SECTION

IN THE INTEREST OF: L.C., a minor child,       CHILDREN'S FAST TRACK APPEAL

                                               OPINION
APPEAL OF: A.C., natural mother.

                                               No.: CP-02-DP-0001191-2014
                                               FID: 02-FN-092189-2010
                                               JID: 92189-A


OPINION

WALKO, J.                                      November 17, 2016


I. **PROCEDURAL HISTORY**

This appeal stems from the involuntary termination of the parental rights of the natural mother, A.C. ("Mother") to L.C. (D.O.B.: 11/ 2013) ("the Child"). Allegheny County Office of Children, Youth and Family Services ("CYF") has been involved with this family since November of 2013. Mother was initially compliant with the family plan goals established by CYF. On June 8, 2014 the Child was again referred to CYF after Mother was involved in an accident and admitted to being under the influence of narcotics. The Child was removed and placed with her maternal grandparents.

The Child was adjudicated dependent on September 8, 2014. *See* Order of Court, dated September 8, 2014. The Permanent Placement Goal for the Child was to return her to Mother. *See* Order of Court, dated December 2, 2014.

In the two years following the adjudication of dependency the Court held multiple Permanency Review Hearings. Mother made little to no progress toward accomplishing the established family plan goals. On March 24, 2015, the Court held a Permanency Review Hearing and found that Mother had been moderately compliant with the permanency plan. *See* Permanency

1

Review Order, dated March 24, 2015. Another Permanency Review Hearing was held on June 16, 2015 and the Court found that Mother had made "minimal progress toward alleviating the circumstances which necessitated the original placement." *See* Permanency Review Order, dated June 16, 2015. On October 13, 2015 the Court again held a Permanency Review Hearing and again found Mother to be minimally compliant with established goals.[1] *See* Permanency Review Order, dated October 13, 2015.

On April 12, 2016, the Court again found Mother to have made "minimal progress toward alleviating the circumstances which necessitated the original placement" of the Child. *See* Permanency Review Order, dated April 12, 2016. On April 12, 2016 the Court determined that adoption would be the new permanent placement goal. *Id.* CYF subsequently filed a Petition for Termination of Parental Rights. On September 23, 2016, following a hearing on the Petition, this Court entered an Order terminating the parental rights of Mother to the Child. The Court further awarded custody of the Child to CYF in order to initiate adoption proceedings. Termination of Mother's parental rights also extinguished her right to object to or receive notice of adoption proceedings regarding the Child. *See* Order of Court, dated September 23, 2016. Mother appeals.

Mother makes four arguments on appeal. First, she contends that the Court erred and abused its discretion in granting the Petition for Involuntary Termination of Parental Rights pursuant to 23 Pa.C.S.A. 2511(a)(2) and (8). Second, Mother argues that the Court erred and abused its discretion in not determining if the severance of the bond existing between Mother and the Child would adversely affect the Child. Third, Mother contends that the Court abused its discretion and erred when it determined by clear and convincing evidence that placement of the Child with the foster parents

---

[1] The Order of Court states that "[t]here has been minimal compliance with permanency plan, in that Mother has not signed releases of information for the agency. Mother does not submit to random urine screens. Mother does not maintain contact with the agency."

2

was in the best interest of the Child. Mother also argues that Court abused its discretion in finding that the involuntary termination of the parental rights best serves the needs and welfare of the Child. *See* Mother's Concise Statement of Matters Complained of on Appeal, at Paragraph 1(a)-(d). For the following reasons, this Court's Order should be affirmed.

## II. FACTS

### a. Allegheny County Office of Children, Youth and Family Services

Amber Saunders, a CYF Caseworker assigned to the case, testified regarding the circumstances under which the Child became involved with CYF and Mother's progress thereafter[2]. Ms. Saunders testified that CYF began working with the family in November of 2013 due to issues with drugs and alcohol. *See* T.P.R. Hearing, 8/23/16, at 8. Ms. Saunders testified that CYF initially became involved because the agency was informed that the Child had tested positive for cocaine and opiates at birth. *Id.* at 9. Mother was referred to Pennsylvania Organization for Women in Early Recovery ("POWER"). *Id.* CYF established "family service plan goals" which included completing drug and alcohol and mental health evaluations, attending parenting classes and scheduled visits at Arsenal Family and Children's Center ("Arsenal"), acquiring stable and appropriate housing and maintaining contact and cooperation with CYF. *Id.* at 10. Ms. Saunders testified that Mother was initially compliant with the family plan goals. *Id.* at 11, 12. On June 8, 2014, however, Mother and the Child's father were involved in a car accident. *Id.* at 8. The Child's father was driving when he rear-ended another vehicle that was stopped in front of him. *Id.* Mother was admitted to the intensive care unit and was treated for a spinal fracture. *Id.* At the hospital Mother disclosed her use of Subotex and heroin. *Id.* Ms. Saunders testified that it was clear that Mother had relapsed and CYF wanted

---

[2] Ms. Saunders testified on the first day of a two-day hearing. Citations to her testimony refer to the transcript from the Termination of Parental Rights Hearing of 8/23/2016.

3

her to readdress her issues accordingly. *Id.* at 11, 12. The Child was removed from Mother's care and placed in the custody of her maternal grandparents. *Id.*

Based on Mother's self-reported relapse CYF again established family plan goals. *Id.* Specifically, CYF wanted Mother to continue drug and alcohol treatment and to be consistent in attending urine screens. *Id.* Mother was re-referred to POWER for assistance. *Id.* at 11. POWER reported to CYF, however, that they were unable to reach Mother. *Id.* at 26. CYF never received confirmation of Mother's POWER assessment. *Id.* at 26. Mother was also referred to Mercy Behavioral Health ("Mercy") for mental health services. *Id.* at 16. CYF recommended that Mother participate in a dual diagnosis program that would address both her mental health and her issues with drugs and alcohol. *Id.* CYF also provided in-home services through Wesley Spectrum to Mother from July 2015 until September 2015. *Id.* Wesley Spectrum services were discontinued, however, because of Mother's noncompliance. *Id.* CYF received records that Mother attended Tadiso, an outpatient opioid treatment facility, for methadone maintenance in the fall of 2014 until December of 2015. *Id.* at 18. Thereafter Mother went to Alliance for methadone maintenance. *Id.* Mother's report indicated that at the time of the hearing she was not receiving any formal treatment but that she intended to go to Mercy. *Id.* Ms. Saunders testified that CYF was aware that Mother was last involved in methadone maintenance in May of 2016. *Id.* CYF called in random urine screens for Mother but she was inconsistent in her compliance. *Id.* Mother was called for 77 screens and attended 24. *Id.* at 19. Mother was ordered by the Court to submit to hair follicle tests and failed to do so on multiple occasions. *Id.* at 18. Mother has reported to CYF that she is "clean" but Ms. Saunders testified that she has no evidence to support Mother's claim. *Id.* at 19. Ms. Saunders further testified that at the time of the hearing it was CYF's opinion that Mother had not successfully addressed her addiction or completed her drug and alcohol goals. *Id.* at 18.

4

CYF had established goals for Mother to obtain stable and appropriate housing and provided her with information for shelters and other programs. *Id.* at 10, 20. Mother's housing has been unstable throughout the pendency of this case. *Id.* at 20. Mother had housing with the Child's father from May of 2015 until February of 2016 when the couple was evicted. *Id.* Following the eviction Mother was homeless and staying at shelters or with friends. *Id.* CYF considers a parent to be homeless if they are staying in shelters. *Id.* Ms. Saunders testified that Mother obtained housing with the Child's father in July or August of 2016. *Id.* at 29.

With respect to visitation, CYF had established goals for Mother to attend parenting classes and scheduled visits and to maintain contact and cooperation with the agency. *Id.* at 10. Mother always visited the Child together with Child's father. *Id.* at 30. Visits were initially required to be supervised until August of 2015. *Id.* Mother participated in supervised parenting visits at Arsenal. *Id.* at 28. She successfully completed the Arsenal program on May 19, 2015. *Id.* From August 2015 until March of 2016 Mother was permitted to have unsupervised community visits. *Id.* CYF reverted back to supervised visits due to safety concerns when Mother was evicted and homeless. *Id.* Mother and Child's father visited the Child at the CYF East Office thereafter. *Id.* at 30. Ms. Saunders testified that the staff who supervised the visits had concerns that Mother "misreads the [Child's] cues." *Id.* at 43. CYF had also recommended that Mother attend the Three Rivers Adoption Council ("TRAC") for individual and family therapy. *Id.* at 33. Mother, however, failed to engage the services of TRAC. *Id.* CYF had continuous issues with visitation. *Id.* Mother constantly confirmed visits and then failed to arrive as scheduled. *Id.* The Child would be taken to the CYF office for a confirmed visit and the parents would often not show. *Id.* CYF attempted to solve the problem by requiring the couple to confirm visits 24 hours ahead of time. *Id.* at 31. Even after confirmation, however, there were times when they would not appear. *Id.* CYF had difficulty communicating with Mother and did not have a

5

working telephone number for the couple. Ms. Saunders testified that when she was in contact with Mother, Mother was compliant and made an effort to work through the planning process. *Id.* at 21. Often, however, Ms. Saunders had to be physically present in order to communicate with Mother. *Id.* at 47. Ms. Saunders further testified that Mother has not met her contact goals. *Id.*

Mother and the Child's father attended only 132 of the 187 scheduled visits – "about 70%." *Id.* at 30. The couple was initially given visitation twice per week: Thursdays from 4:00 PM until 7:00 PM and Sundays from 12:00 PM until 2:00 PM. *Id.* By the time of the September 23, 2016 hearing, however, the visits were reduced to once a week due to lack of progress. *Id.* at 38. The most recent visit occurred on August 18, 2016. *Id.* That visit ended early because a CYF caseworker had concerns with the couples' interaction with the Child. *Id.* at 56. A confrontation ensued between the couple and the caseworker when the caseworker terminated the session. *Id.*

Given the above information Ms. Saunders testified that Mother had not successfully completed the CYF family service plan goals. *Id.* at 33. By the time of the hearing, CYF remained concerned that they could not confirm whether or not Mother was still abusing drugs and that she had a history of instability with respect to housing. *Id.*

b. Psychological Evaluations

Dr. O'Hara is a licensed psychologist in Pennsylvania who evaluated all of the parties involved in this case.[3] (*See* T.P.R. Hearing, 9/13/2016). Dr. O'Hara performed an interactional evaluation with the Child and the maternal grandparents on March 1, 2016. *Id.* at 4. Dr. O'Hara testified that the maternal grandparents "presented with stability" and had no history of substance abuse or criminal activity. *Id.* at 4-6. The maternal grandparents displayed positive parenting skills and were engaging. *Id.* at 6. The Child approached the maternal grandparents frequently and

---

[3] Dr. O'Hara testified on the second day of a two-day hearing. Citations to his testimony refer to the transcript from the Termination of Parental Rights Hearing of 9/13/2016.

spontaneously and interacted well with them. *Id.* Dr. O'Hara further testified that the Child displayed "all indicators of secure attachment" to her grandparents as caregivers. *Id.*

Dr. O'Hara testified that Mother had previously reported to him in June of 2013. *Id.* at 8. At that time Mother reported that she was unable to commit to twice-weekly treatments which Dr. O'Hara found to be warranted for her. *Id.* Mother participated in an individual evaluation with Dr. O'Hara on March 22, 2016. *Id.* at 4. Dr. O'Hara testified that there were a variety of concerns surrounding Mother. *Id* at 8. Mother acknowledged relapses after three rehabs and a variety of other treatments. *Id.* at 9. Mother disclosed her criminal history which includes convictions for prostitution, retail theft and possession. *Id.* at 8. She was unemployed, homeless and on probation at the time of the evaluation. *Id.* Dr. O'Hara testified that Mother had less than 90 days of "clean time" at the time of the evaluation. *Id.* at 9. Mother reported that in nine years her longest period of "clean time" was 18 months and that part of it was during her pregnancy with the Child's older sibling. *Id.* Dr. O'Hara reported that Mother was "defensive in psychological testing" and diagnosed her with "opioid use disorder severe, on maintenance therapy." *Id.*

Dr. O'Hara performed an interactional evaluation with Mother, the Child's father and the Child on March 22, 2016. *Id.* He testified that Mother displayed positive parenting skills, that she was playful and calm and that she showed affection well. *Id.* During the evaluation the Child was calm and relaxed with the couple and Dr. O'Hara found there to be components of security in their relationship. *Id.* at 11. Dr. O'Hara testified, however, that he had substantial concerns regarding Mother's stability. *Id.* at 12. Specifically Dr. O'Hara was concerned that Mother still showed signs of being unable to care for the Child despite her being removed for two years. *Id.* Mother acknowledged that she was not in a position to care for the Child. *Id.*

7

Dr. O'Hara considered all of the information from CYF, discussed *supra*, and additional information from KidsVoice in rendering his opinion. *Id.* at 12, 13. He testified that he received reports that Mother was not attending treatment outside of her methadone or suboxone clinics. *Id.* In Dr. O'Hara's opinion this type of treatment is "substandard" on its own. *Id.* at 13. He also considered the evaluations and the level of attachment between the Child and the maternal grandparents as caregivers. *Id.* He testified that without security and stability for children they are at risk for a variety of problems which include a "lack of school readiness, behavioral issues, depression and anxiety and reactive attachment disorder." *Id.* at 15. Dr. O'Hara had continuing concerns regarding Mother's failure to address her "extreme lack of stability," "significant substance abuse" and "long-term criminal activity." *Id.* at 15. Based on the foregoing Dr. O'Hara concluded that the benefits of adoption for the Child with the maternal grandparents outweigh the potential detriment of terminating Mother's parental rights. *Id.* at 16. Dr. O'Hara made these recommendations and came to these conclusions based upon a reasonable degree of psychological certainty. *Id.*

c. **Mother's Testimony**

Mother testified[4] that she has been "clean from methadone" since June 21, 2016 and that she became "clean" on her own. *See* T.P.R. Hearing, 9/13/2016, at 35. Mother gave birth to a third child in November of 2015. *Id.* at 38. Mother testified that she had three surgeries during her pregnancy and that she was prescribed pain medication accordingly. *Id.* at 38. She signed a contract with her doctors under which she agreed to submit to weekly drug screens. *Id.* at 39. The doctors would continue to administer pain management medication so long as the drug screens reflected her use of methadone and prescribed pain medication only. *Id.* Mother testified that she was compliant with the terms of the contract. *Id.* As stated previously, Mother testified that she has been "clean" since June

---

[4] Mother testified on the second day of a two-day hearing. Citation to her testimony refers to the transcript from the Termination of Parental Rights Hearing of 9/13/2016.

8

21, 2016. *Id.* at 40. When asked if she had tests or screens to confirm her sobriety, however, Mother stated "I believe so. I'd have to look. I'm not sure." *Id.* She further testified that she is in a "different situation" in that she has stable housing and is no longer on a maintenance program. *Id.* at 36. Mother stated that she is voluntarily attending Narcotics Anonymous ("NA") and that she plans to start attending mental health services at Mercy once her back injury is healed. *Id.* She further testified that she is "in a better place with the [Child]" and that they have "really good visits." *Id.*

## STANDARD OF REVIEW

The standard of review in a termination of parental rights case is that of an abuse of discretion. The Supreme Court of Pennsylvania confirmed the standard of review as follows:

> [w]hen reviewing an appeal from a decree terminating parental rights, [the Superior Court is] limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, [the Superior Court] must accord the hearing judge's decision the same deference that it would give to a jury verdict. [The Superior Court] must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of S.P.*, 616 Pa. 309, 317 (2012) (quoting *In re: B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004)).

## DISCUSSION

In considering a petition for termination of parental rights a trial court is charged with determining whether grounds for termination have been established by clear and convincing evidence under 23 Pa.C.S. § 2511(a). The Court shall give "primary consideration to the developmental, physical and emotional needs and welfare of the child." Id. at § 2511(b). The statute further provides nine (9) grounds for termination. Id. at § 2511(a). A petitioning party need only establish one of the

9

nine grounds to support a claim for termination of parental rights. Id. In this case, the Court found that Mother's parental rights should be terminated pursuant to § 2511(a)(2), (5) and (8).

Under § 2511(a)(2) a trial court may terminate parental rights based on clear and convincing evidence that the

> [r]epeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The Child was days old when this case was initially referred to CYF in November of 2013. As discussed *supra*, CYF established family service plan goals and Mother was initially compliant. It became clear, however, in June of 2014 that Mother had relapsed when she was involved car accident and reported her heroin use to the hospital staff. The Child was taken into custody by CYF and placed with her maternal grandparents. During the two years following the placement Mother has made little to no progress with respect to established family service plan goals. Ms. Saunders, a CYF caseworker, and Dr. O'Hara, a psychologist, both testified regarding Mother's lack of progress. Given the amount of time that the Child has been in placement and the testimony at the hearing, this Court has serious concerns regarding Mother's ability to provide a stable environment necessary for the physical and mental wellbeing of the Child. During the pendency of this case Mother has admittedly struggled to achieve sobriety, has been homeless and was convicted and sentenced to probation for prostitution. None of these behaviors are safe or conducive to the wellbeing of the Child. These behaviors display a repeated and continued incapacity to provide essential care. Mother has attended 70% of the scheduled visits with the Child and has been largely noncompliant and uncooperative with CYF's contact and communication goals. As recently as March 22, 2016 Mother acknowledged to Dr. O'Hara that she was not in a position to care for the Child. Despite Mother's

subsequent attempts, it was apparent at the time of the hearing that these issues had not been adequately remedied by Mother.

Section 2511(a)(5) of the statute enables a trial court to terminate parental rights based on a finding that

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

As discussed *supra*, the Child was removed from Mother's care in June of 2014 and has since been placed with her maternal grandparents. The period of removal far exceeds the 6-month threshold provided for in the statute. Despite the efforts of CYF, KidsVoice and Dr. O'Hara, Mother continued to display the behavior that warranted removal of the Child in the first place. Mother disregarded the advice of CYF to contact TRAC and POWER for additional parenting assistance. The Court is cautious to accept Mother's claims of sobriety. Mother testified that her "clean date" is June 21, 2016. Not only is this a very recent date with respect to the two years that this case has been pending, Mother has acknowledged multiple relapses after repeated attempts at rehabilitation. At the hearing Mother was unsure as to whether she could produce evidence of her sobriety. It appears that given Mother's history of instability and inconsistency she is still struggling to achieve and maintain sobriety. This case has been pending with CYF since the removal of the Child in 2014. Mother has had two years, therefore, to become sober and stable. The Court finds that two years is more than a reasonable amount of time to remedy Mother's problems in order to adequately support the needs of the Child.

Dr. O'Hara testified that adoption at this point outweighs any potential detriment of the termination of parental rights. The Child has become attached to the maternal grandparents as

11

caregivers. Maternal grandparents provide a stable and nurturing environment for the Child. The lack of stability and security offered by Mother pose a threat to the emotional and behavioral needs of the Child. Based on the foregoing the Court determined that termination of Mother's parental rights serves the needs and welfare of the Child.

Under § 2511(a)(8) a trial court may terminate parental rights based upon a finding of clear and convincing evidence that

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

The Court applied the same reasoning under §2511(a)(8) as under §2511(a)(5) in determining that clear and convincing evidence had been presented to warrant a termination of Mother's parental rights. In the interest of clarity the Court reiterates that two years have elapsed since the Child was removed from Mother's care. CYF and Dr. O'Hara testified regarding their concerns for Mother's progress and lack of stability. Both CYF and Dr. O'Hara opined that Mother was not in any position to appropriately care for the Child. Given Mother's drug history, criminal background and lack of progress within a two-year period the Court determined that terminating Mother's parental rights serve the needs and welfare of the Child.

As stated *supra*, Pa.C.S. § 2511(b) requires a court to consider the developmental, physical and emotional needs and welfare of the child. The Superior Court of Pennsylvania has established that a trial court must consider the emotional bond, if any, between the parent and child as a factor in determining the needs of a child.

The Court first considered the Child's age during the pendency of this case. As stated *supra* the Child was days old when the case was first referred to CYF. She was removed and placed with

12

her maternal grandparents on June 8, 2014. The Child was less than seven (7) months old at the time of her removal and was nine (9) months old when she was adjudicated dependent. The Child has spent the majority of her life in the custody of her maternal grandparents. Mother was given the opportunity to visit the Children during the pendency of this case but has only attended 70% of her scheduled visits. Due to the amount of time that the Child has spent away from Mother in the early years of her life and Mother's willful lack of visitation, the Court finds that there is not a substantial bond between Mother and the Child.

Dr. O'Hara testified that Mother displayed positive parenting skills and that she was playful, calm and affectionate. During the interactional evaluation, Dr. O'Hara found that the Child interacted well with Mother. Dr. O'Hara further testified, however, that the Child displayed signs of secure attachment to her maternal grandparents as caregivers. While Mother's positive interactions are noted, the Court finds that Child has a strong bond with her maternal grandparents. Given the age of the Child and the level of attachment to their maternal grandparents, the Court finds that termination of parental rights best serves the developmental, physical and emotional needs of the Child.

## CONCLUSION

The law is clear that the purpose of dependency actions is to determine a permanent placement that best serves the needs and welfare of the child. The purpose is not to hold children in foster care until their parents get sober or become adequate caregivers no matter how long it takes. The Court determined that the termination of Mother's parental rights was necessary to serve the interests of the Child. For the foregoing reasons, this Court respectfully requests that Mother's appeal be denied and the decree terminating her parental rights to the Child be affirmed.

BY THE COURT:

_____, J.

13